## UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| Bill.com, LLC,<br><br>               Plaintiff,<br><br>v.<br><br>Danielle Cox,<br><br>               Defendant. | **DECLARATION OF ALISA LEWIS IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**<br><br>Case No. |

I, Alisa Lewis, pursuant to 28 U.S.C. § 1746, declare:

1.     I am over the age of 18 and have personal knowledge of the matters contained herein. I could and would testify competently to such facts if called as a witness.

2.     I am currently employed as the Vice President of People for Bill.com, LLC ("BILL"). In my role, I help oversee BILL's human resources department. I am familiar with Danielle Cox through my work at BILL, and am also familiar with her position and agreements with her prior employer, DivvyPay, Inc.

3.     On or about March 11, 2019, Ms. Cox joined DivvyPay, Inc., a provider of expense management software to other businesses, as an IT Manager. DivvyPay, Inc. was later acquired by BILL in May of 2021 and Ms. Cox continued her employment with BILL as a Director of Information Technology in BILL's IT group.

4.     When Ms. Cox joined DivvyPay, Inc., and as a condition of her employment and before being given access to any confidential information, she was required to enter into a Proprietary Information and Inventions Agreement, dated February 27, 2019. Later, and again as

a condition of her ongoing at-will employment and continuing access to confidential information, Ms. Cox was required to enter into an updated Proprietary Information and Inventions Agreement dated October 9, 2019 ("the Agreement"). A true and correct copy of the Agreement is attached hereto as **<u>Exhibit 1</u>**.

5.     When BILL acquired DivvyPay, Inc. in May of 2021, DivvyPay, Inc.'s rights under the Agreement were assumed by BILL as a matter of law in connection with that acquisition. At the same time, Ms. Cox acknowledged that the Agreement would remain effective after the acquisition was complete. A true and correct copy of Cox's acknowledgment of her employment with BILL and the ongoing nature of her contractual obligations under the Agreement is attached as **<u>Exhibit 2</u>**.

6.     The Agreement contains certain restrictions on Ms. Cox's activities while she was employed by BILL and after, along with restrictions on Ms. Cox's use of BILL's confidential and trade secret information. In the Agreement, Ms. Cox acknowledged that she was being given access to valuable proprietary information, defined in the Agreement as:

> "information owned by the Company or licensed from third parties regarding (a) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, contracts and other agreements, suppliers, customers, and customer lists; (b) the identity, skills and compensation of employees, contractors, and consultants; (c) specialized training; and (d) information related to Inventions owned by the Company or licensed from third parties."

(Exhibit 1, § 1.4.)

7.     With regard to that confidential information, Ms. Cox acknowledged and agreed that:

> "…during my Service and thereafter, pursuant to this agreement, I will hold in strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or

# EXHIBIT B

> publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with my Service, or unless the Chief Executive Officer or Board of Directors of the Company expressly authorizes such disclosure in writing."

(Exhibit 1, § 2.1.)

8.      Ms. Cox further agreed that if her employment ever ended, she would return all property of the company, "including but not limited to laptops, pagers, cell phones, corporate credit cards, keys and/or access cards." Ms. Cox also agreed that such property of the company was subject to inspection at any time, with or without notice. (Exhibit 1, § 11.)

9.      In addition to her obligations under the Agreement, Ms. Cox also agreed to BILL's Acceptable Use Policy, which was made available to all employees and referenced in BILL's company handbook.

10.      Ms. Cox agreed that the Agreement would be governed by and construed in accordance with the law of the State of Utah. (Exhibit 1, § 15.1.) Ms. Cox also agreed that in any action to enforce the confidentiality restrictions in the Agreement, that injunctive and equitable relief would be appropriate without the necessity of posting a bond, and that such an action should be tried and litigated in the state or federal courts of Utah. (Exhibit 1, § 15.2.)

11.      Ms. Cox also agreed in her Offer Letter agreement with DivvyPay, Inc. that, except for actions seeking injunctive relief as a result of her breach of the Agreement, any dispute arising from her employment would be subject to binding arbitration. A true and correct copy of that Offer Letter agreement is attached hereto as **Exhibit 3**. Those rights were also assumed by BILL as a matter of law in connection with the acquisition of DivvyPay, Inc.

12.      On or about November 30, 2022, Ms. Cox requested a leave of absence from BILL. That request was granted and Ms. Cox's leave was to begin on Monday, December 5, 2022.

13. On December 21, 2022, BILL representatives learned that suspicious activity had been discovered on Ms. Cox's BILL computer and accounts, and that her access to BILL's systems was being suspended. On December 21, 2022, BILL discovered Ms. Cox's aforementioned access and downloading of emails and the company's Slack account and immediately suspended her access to the company's networks.

14. The next day, December 22, 2022, BILL representatives including myself attempted to contact Ms. Cox by phone, text message, and email to her personal email account to request an explanation of her actions, and to request the immediate return of BILL's company-issued computer and any data belonging to the company. BILL representatives continued to contact Ms. Cox in the following days and in the week after Christmas. Ms. Cox ignored every attempt at communication.

15. I understand that on December 29, 2022, BILL's outside counsel sent cease and desist correspondence to Ms. Cox, both through her personal email and at her home, demanding that she immediately return BILL's equipment and data, and that she confirm that the information she exfiltrated was not being shared or disclosed with any other third party. A true and correct copy of that correspondence is attached hereto as **<u>Exhibit 4</u>**. Again, my understanding is that Ms. Cox did not respond to that communication.

16. As a result of her refusal to return the Company's property or explain her actions, BILL terminated Ms. Cox as an employee effective January 9, 2023. That same day, a BILL representative spoke to Ms. Cox telephonically and told her that the company would pursue legal action if she continued to ignore its demands for the return of its equipment and data. As of the filing of this lawsuit, Ms. Cox has not responded to BILL or its outside counsel in any way.

DocuSign Envelope ID: 6AE28B89-5176-46B0-892B-86D1F0D7CC76

[signature page follows]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of January, 2023.

*Alisa Lewis*

F5FA78C00FCF451...

Alisa Lewis

# EXHIBIT 1

# PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT
### *[Use for Full-Time Employees and Consultants]*

In consideration of my employment or engagement by DivvyPay, Inc. (the "**Company**"), the Company's disclosure of or agreement to disclose certain Proprietary Information (as defined below) to me, any compensation now and/or hereafter paid to me, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agrees with the Company as follows:

1. **Definitions**.

1.1 The term "***Agreement***" means this Proprietary Information and Inventions Agreement.

1.2 The term "***Service***" means any period during which I am engaged as a full-time employee or consultant of the Company.

1.3 The term "***Inventions***" means discoveries; developments; trade secrets; processes; formulas; data; lists; software programs; and all other works of authorship, mask works, ideas, concepts, know-how, designs, and techniques, whether or not any of the foregoing is or are patentable, copyrightable, or registrable under any intellectual property laws or industrial property laws in the United States or elsewhere.

1.4 The term "***Proprietary Information***" means information owned by the Company or licensed from third parties regarding (a) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, contracts and other agreements, suppliers, customers, and customer lists; (b) the identity, skills and compensation of employees, contractors, and consultants; (c) specialized training; and (d) information related to Inventions owned by the Company or licensed from third parties.

1.5 The term "***Third Party Information***" means confidential or trade secret information that the Company may from time to time receive from third parties or information related to Inventions of third parties, which is subject to a duty on the Company's part to maintain the confidentiality of such Third Party Information and to use it only for certain limited purposes.

2. **Nondisclosure**.

2.1 I acknowledge that contemporaneously with my execution of this Agreement, the Company is providing me with Proprietary Information and/or initial specialized training. In consideration of the Company's provision of Proprietary Information and initial specialized training, I agree that during my Service and

thereafter, pursuant to this agreement, I will hold in strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with my Service, or unless the Chief Executive Officer or Board of Directors of the Company expressly authorizes such disclosure in writing. I also agree that in connection with this Agreement, I will also be bound by the provisions of Sections 7 and 8.

2.2 At all times during my Service and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Third Party Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with my Service, or unless the Chief Executive Officer or the Board of Directors of the Company expressly authorizes such disclosure in writing.

3. **Assignment**.

3.1 The term "***Ownership Rights***" means all rights, title, and interest (including but not limited to Intellectual Property Rights) in property, whether that property is tangible or intangible. The term "***Intellectual Property Rights***" means all intellectual property and industrial property rights of any kind whatsoever throughout the world, including but not limited to patent rights, copyrights (including but not limited to mask work rights), trade secret rights, and, if recognized, Moral Rights (where "***Moral Rights***" means all rights related to paternity, integrity, disclosure, and withdrawal). I hereby irrevocably assign to the Company any Ownership Rights I may have or acquire in any Proprietary Information and acknowledge that all Proprietary Information shall be the sole property of the Company and that the Company shall be the sole owner of all Ownership Rights in connection therewith.

3.2 The term "***Company Inventions***" means all Inventions that (a) relate to the business or proposed business of the Company and that are discovered, developed, created, conceived, reduced to practice, made, learned or written by me, either alone or jointly with others, in the course of my Service; (b) utilize, incorporate or otherwise relate to Proprietary Information; (c) I discovered, developed, created, conceived, reduced to practice, made, or wrote prior to or outside the scope of my Service and that are incorporated into any Inventions owned by or assigned to the Company and/or its assigns; or (d) are discovered, developed, created, conceived, reduced to practice, made, or written by me using Company property or equipment. I hereby irrevocably assign to the Company all my Ownership Rights in and to any and all Company Inventions.

3.3 I acknowledge and agree that any work of authorship comprising Company Inventions shall be deemed to be a   "***work made for hire***," as that term is defined in the United States Copyright Act (17 U.S.C. § 101 (2000)). To the extent that any such work of authorship may not be deemed to be a work made for hire, I hereby irrevocably assign all my Ownership Rights in and to such work to the Company. If any such work of

authorship cannot be assigned, I hereby grant to the Company an exclusive, assignable, irrevocable, perpetual, worldwide, sublicensable (through one or multiple tiers), royalty-free, unlimited license to use, reproduce, distribute, create derivative works of, publicly perform, publicly display and digitally perform and display such work in any media now known or hereafter known. Outside the scope of my Service, I agree not to (a) modify, adapt, alter, translate, or create derivative works from any such work of authorship or (b) merge any such work of authorship with other Inventions. To the extent, Moral Rights may not be assignable under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby irrevocably waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

3.4 I acknowledge and agree that nothing in this Agreement shall be deemed to grant, by implication, estoppel or otherwise, (a) a license from the Company to me to make, use, license, or transfer in any way a Company Invention or (b) a license from the Company to me regarding any of the Company's existing or future Ownership Rights.

4. **Enforcement of Rights**.

4.1 I will assist the Company in every proper way to obtain and from time to time enforce Ownership Rights relating to Company Inventions in any and all countries. To that end, I will execute, verify, and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining, and enforcing such Ownership Rights and the assignment thereof. In addition, I will execute, verify, and deliver assignments of such Ownership Rights to the Company. My obligation to assist the Company with respect to Ownership Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my Service, but the Company shall compensate me at a reasonable rate after such termination for the time actually spent by me at the Company's request on such assistance.

4.2 In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its assigns' duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf to execute, verify, and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph thereon with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, that I now or may hereafter have for infringement of any Ownership Rights assigned hereunder to the Company.

5. **Obligation to Keep Company Informed**.

During my Service, I will promptly disclose to the Company fully and in writing and will hold in trust for the sole right and benefit of the Company any and all Company Inventions. In addition, during the first year after termination of my Service, I will provide the Company with a complete copy of each patent application and copyright registration application (including but not limited to any mask work registration application) filed by me or that names me as an inventor, co-inventor, author, co-author, creator, co-creator, developer, or co-developer.

6. **Retained Inventions**.

To preclude any possible uncertainty over the ownership of any Inventions, I have, to the best of my knowledge, set forth on Exhibit A attached hereto a complete list of all Inventions that I have, alone or jointly with others, prior to the commencement of my Service, discovered, developed, created, conceived, reduced to practice, made, learned, or written, or caused to be discovered, developed, created, conceived, reduced to practice, made, learned, or written, that I consider to be my property or the property of third parties (collectively, " *Retained Inventions*"). If disclosure of any such Invention on Exhibit A would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Inventions in Exhibit A but am to inform the Company that all Inventions have not been listed for that reason. To the extent that I incorporate any Retained Inventions into a Company Invention or rely upon any Retained Invention in discovering, developing, creating, conceiving, or reducing to practice any Company Invention, I hereby grant to the Company a non-exclusive, assignable, irrevocable, perpetual, worldwide, sublicensable (through one or multiple tiers), royalty-free license to use, reproduce, distribute, create derivative works of, publicly perform, publicly display, digitally perform and display, make, have made, sell, and offer for sale such Retained Inventions in any media now known or hereafter known.

**7. Non-Competition; Non-Solicitation.**

7.1 During my Service, I will not, directly or indirectly, either for myself or for any other person, partnership, corporation, company or other entity, own any interest in, manage, control, participate in, consult with, render services for, or in any other manner engage or participate in the ownership, management, operation, financing or control of, or be employed by or consult for or otherwise render services to, any person, corporation, firm, or other entity, including any foreign corporation, firm, or other entity, that competes with the Company in the state of Utah, or in any other state in the United States, in the conduct of the Business of the Company as conducted or as proposed to be conducted in the future, specifically including, but not limited to: Concur, Expensify, Brex, Bento, Chase Bank, Wells Fargo, Citi Bank, PEX, American Express, Visa, and Mastercard.  Furthermore, I will not engage in any other activities that conflict with any of my obligations to the Company.  I agree that the aforementioned covenants are reasonable with respect to their duration, geographical area and scope. In particular, I acknowledge and agree that the geographic scope of this restriction is necessary to protect the goodwill and confidential information of Company. For the purposes of this Section 7, "Business" shall mean those portions of the Company's business in which I actively participated, or regarding which I received Proprietary Information.

7.2 During my Service and for a period of one year after my Service is terminated for any reason, I will not, directly or indirectly, individually or on behalf of any other person, firm, partnership, corporation, or business entity of any type, solicit, assist or in any way (i) encourage any current employee or consultant of the Company to terminate his or her employment relationship or consulting relationship with or for the Company, nor will I solicit the services of any former employee or consultant of the Company whose service has been terminated for less than three months, or (ii)  induce or attempt to induce any supplier, licensee, licensor, franchisee or other business relation of Company to cease doing business with Company or in any way interfere with the relationship between any such supplier, licensee or business relation and Company.

7.3 During my Service and for a period of two years after my Service is terminated for any reason, I will not, directly or indirectly, individually or on behalf of any other person, firm, partnership, corporation, or business entity of any type, solicit to the detriment of the Company and/or for the benefit of any competitor of the Company, take away or attempt to take away, in whole or in part, any Customer of the Company, or otherwise interfere with the Company's relationship with any Customer. For purposes of this Section 7.3, "Customer" shall mean any company or business entity to which the Company sells or licenses goods or services to, or that I had contact with or performed services for during my Service.

7.4 If, at the time of enforcement of this Section 7, a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under the circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.  I acknowledge that the restrictions contained in this Section 7 are reasonable and that I have reviewed the provisions of this Agreement.

**8. Post-Employment Non-Compete.**

8.1 I acknowledge that during the course of my employment with Company, I have become familiar with Company's business, that my services have been special, unique and of extraordinary value to Company, and therefore, I agree that for a period of one year after my Service is terminated for any reason, I will not, directly or indirectly, either for myself or for any other person, partnership, corporation, company or other entity, own any interest in, manage, control, participate in, consult with, render services for, or in any other manner engage or participate in the ownership, management, operation, financing or control of, or be employed by or consult for or otherwise render services to, any person, corporation, firm, or other entity, including any foreign corporation, firm, or other entity, that competes with the Company in the state of Utah, or in any other state in the United States, in the conduct of the Business of the Company as conducted or as proposed to be conducted in the future, specifically including, but not limited to: Concur, Expensify, Brex, Bento, Chase Bank, Wells Fargo, Citi Bank, PEX, American Express, Visa, and Mastercard. Notwithstanding the foregoing, I am permitted to own up to 1% of any class of securities of any corporation in competition with the Company that is traded on a national securities exchange or through Nasdaq. For the purposes of this Section 8, " ***Business***" shall mean those portions of the Company's business in which I actively participated, or regarding which I received Proprietary Information.

8.2 If, at the time of enforcement of this Section 8, a court shall hold that the duration, scope or area

restrictions stated herein are unreasonable under the circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.  I acknowledge that the restrictions contained in this Section 8 are reasonable and that I have reviewed the provisions of this Agreement.

9. **No Improper Use of Materials**.

I represent and warrant that during my Service I shall not use or incorporate into any Company Invention any confidential information or trade secrets of any former employer, any person or entity for whom I provided services, or any other person or entity unless I have obtained all consents, licenses, or other rights necessary to allow me to provide the Company with the assi
gnments and licenses set forth herein. I represent and warrant that during my Service I shall not improperly use or disclose any confidential or trade secret information, if any, of any former employer or any other person or entity to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person or entity to whom I have an obligation of confidentiality unless expressly consented to in writing by that former employer, person, or entity.

10. **No Conflicting Obligation**.

I represent that my performance of all the terms of this Agreement and my Service does not and will not breach any agreement between me and any other employer, customer, person or entity. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

11. **Return of Company Property**.

When my Service is completed, I will immediately deliver to the Company all drawings, notes, memoranda, specifications, devices, formulas, and documents (whether written, printed, or otherwise reproduced or recorded), together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information. I will also immediately deliver all Company property; including but not limited to laptops, pagers, cell phones, corporate credit cards, keys and/or access cards. I further agree that all property situated on the Company's premises and owned, leased, or licensed by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of the Company at any time with or without notice.

12. **Legal and Equitable Remedies**.

Because my services are personal and unique and because I will have access to and become acquainted with Proprietary Information, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

13. **Authorization to Notify New Employer**.

I hereby authorize the Company to notify any new employer or entity for which I provide services about my rights and obligations under this Agreement following the termination of my Service.

14. **Notices**.

Any notices required or permitted hereunder shall be given to the appropriate party at the party's last known address. Such notice shall be deemed given upon personal delivery to the last known address or if sent by certified or registered mail, three days after the date of mailing.

15. **General Provisions**.

15.1 Governing Law. This Agreement will be governed by and construed according to the laws of the State of Utah, without regard to conflicts of law principles.

15.2 Exclusive Forum. I hereby irrevocably agree that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Utah, and I agree to the exclusive personal jurisdiction and venue of any court in Utah County, Utah and waive any defense thereto.

15.3 Entire Agreement. This Agreement, and any offer letter, consulting agreement or employment agreement signed concurrently herewith, supersedes and merges all prior discussions between us relating to the subject matter hereof. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

15.4 Severability.
   a. I acknowledge and agree that each agreement and covenant set forth herein constitutes a separate agreement independe
   
   b. I understand and agree that Section 8 of this Agreement is to be enforced to the fullest extent permitted by law. According

15.5 Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators, and

other legal representatives and will be for the benefit of the Company, its successors and assigns. I expressly agree that the Company has the right to assign this Agreement.

15.6 Survival. The provisions of this Agreement shall survive the termination of my Service for any reason and the assignment of this Agreement by the Company to any successor in interest or other assignee(s).

15.7 At-Will Relationship. I agree and understand that my Service is at will, which means that either I or the Company may terminate the relationship at any time, with or without prior notice and with or without cause. I further agree and understand that nothing in this Agreement shall confer any right with respect to the continuation of Service, nor shall it interfere in any way with my right or the Company's right to terminate my Service at any time, with or without cause.

15.8 Waiver. No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

15.9 Recovery of Attorney's Fees. In the event of any litigation arising from or relating to this Agreement, the prevailing party in such litigation proceedings shall be entitled to recover, from the non-prevailing party, the prevailing party's reasonable costs and attorney's fees, in addition to all other legal or equitable remedies to which it may otherwise be entitled.

15.10 Headings; Counterparts. The headings to each section or paragraph of this Agreement are provided for convenience of reference only and shall have no legal effect in the interpretation of the terms hereof. This Agreement may be executed in counterparts and by facsimile signatures.

I HAVE READ THIS PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.

This Agreement shall be effective as of the first day of my Service.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS MY RIGHTS TO INVENTIONS I MAKE DURING MY SERVICE, RESTRICTS MY RIGHT TO DISCLOSE OR USE PROPRIETARY INFORMATION DURING OR SUBSEQUENT TO MY PERIOD OF SERVICE, AND PROHIBITS ME FROM COMPETING WITH THE COMPANY AND/OR FROM SOLICITING EMPLOYEES AND CUSTOMERS OF THE COMPANY DURING MY SERVICE AND FOR A PERIOD OF TIME AFTER MY SERVICE IS TERMINATED FOR ANY REASON.

Employee

Danielle Cox

Dated: 10/09/2019

Accepted and Agreed to:

Name: Casey Bailey

Title: Vice President, People & Places

If you have inventions to disclose, please complete the attached form and send to
casey.bailey@divvypay.com.

# EXHIBIT 2



6220 America Center Drive, Suite 100, San Jose, CA 95002

May 21, 2021

Re: Continued Employment - DivvyPay, LLC

Dear Danielle,

I am very pleased to confirm our offer to continue your employment with DivvyPay, LLC which will be a wholly-owned subsidiary of Bill.com Holdings, Inc. ("Bill.com" or the "Company")[23].  As you know, Bill.com is acquiring your employer, DivvyPay, Inc., a Delaware corporation ("DivvyPay"), pursuant to the Agreement and Plan of Merger dated as of May 6, 2021 (the "Merger Agreement") by and among Bill.com, DivvyPay and certain other parties named therein (the "Merger").  While your title is expected to remain the same as currently at DivvyPay, you will also be assigned an initial seniority level with Bill.com, which will be communicated to you following the Closing via Workday.  Other than expressly set forth herein, the terms of your employment (including your base salary, bonus, and reporting manager), shall initially remain the same.  This agreement is contingent upon, and shall be effective at, the closing of the Merger (the "Closing"); in the event that the Closing does not occur, your employment will continue to be governed by your existing offer letter with DivvyPay.

In connection with your continued employment, we'd like to highlight the following terms and conditions:

1. **Equity Grants**.  The RSUs will permit payment of taxes through sale of shares.

2. **Employee Benefits.**  You will be eligible to participate in a number of Company-sponsored benefits to the extent that you comply with the eligibility requirements of each such benefit plan. The Company, in

---

[23] 1 Any reference to "the Company" or "Bill.com" will be understood to include any direct or indirect subsidiary of the Company that employs you, including DivvyPay LLC.



6220 America Center Drive, Suite 100, San Jose, CA 95002

its sole discretion, may amend, suspend or terminate its employee benefits at any time. It is currently anticipated that you will continue participating in DivvyPay-sponsored benefits, including with respect to vacation accrual, unless and until you are transitioned to participate in the Company's employee benefits, except that DivvyPay's 401k plan will be terminated the day prior to the Closing, subject to the Closing taking place, and you will be offered the opportunity to participate in the Company's 401k plan in accordance with its terms.

3. **At Will Employment**.  While we look forward to a long and profitable relationship, should you decide to accept our offer of continued employment, you will remain an at-will employee, which means the employment relationship can be terminated by either of us for any reason, at any time, with or without prior notice and with or without cause.  Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this letter) should be regarded by you as ineffective. Further, your participation in any stock option, equity award or benefit program is not to be regarded as assuring you of continuing employment for any particular period of time.  Any modification or change in your at-will employment status may only occur by way of a written agreement signed by you and an authorized representative of Bill.com.  While it is anticipated that these initial terms will continue, the Company reserves the right to change or modify the employment terms in the future.

4. **Acceptance**.  This offer to continue employment on these terms will remain open until May26, 2021. If you decide to accept our continuing offer, and I hope you will, please sign the enclosed copy of this letter in the space indicated and return it to me.  This offer is rescinded if you do not start your employment with Bill.com upon the closing of the Merger.  Your signature will acknowledge that you have read and understood and agreed to the terms and conditions of this letter.  Should you have anything else that you wish to discuss, please do not hesitate to call me.

We look forward to the opportunity to welcome you to Bill.com.

DocuSigned by:

*Jackie Hendy*

B4F3F0ECB881426...

Jacqueline Hendy

SVP, People



I have read and understood this letter and hereby acknowledge, accept and agree to the terms as set forth above and further acknowledge that no other commitments were made to me as part of my continued employment offer except as specifically set forth herein.

DocuSigned by:

*Danielle Cox*

4A5CE27ZAEDB47C

Danielle Cox

# EXHIBIT 3



2500 W Executive Pkwy, 400
Lehi, Lehi 84043

February 27, 2019

Re: Offer Letter

Dear Danielle,

We are pleased to offer you the position as IT Manager with Divvy Pay, Inc. (the "*Company*"). Your start date will be March 11, 2019 or a date mutually-agreeable to you and the Company. As IT Manager, you will report to Deric Abel, Director of Technical Operations, and will receive a base salary in the amount of ███████████████y payable in accordance with the Company's regular payroll practices. Your base salary will be subject to statutory deductions and withholding. As an employee of the Company you will be eligible to enroll in the Company's benefit programs, as such programs are adopted by the Company. Your duties may change from time to time. We will determine a mutually acceptable start date following your acceptance of this Letter. You acknowledge that you have no contractual or other legal obligations that would prohibit you from performing these duties. During your employment with the Company, you will not engage in any other employment, consulting, or other business activity, without the prior written consent of an authorized representative of the Company.

Subject to the approval of the Company's board of directors, you will be granted an option to purchase an aggregate total of ███████████████████████████ ████████ The exercise price of your option (on a per share basis) will be the fair market value of the Company's Common Stock on the date the option is granted to you, and your option will at all times be subject to the terms and conditions applicable to options granted under that Plan and the applicable Stock Option Agreement. Your option will vest over four (4) years from the date of grant (including the date of any prior grant(s) you may have received) and as otherwise may be described in the applicable stock option agreement (including the stock option agreement(s) for any prior grants). Your option shares will be subject to repurchase by the Company in the event that your service terminates, or you propose to transfer the shares. Your option will qualify as an "Incentive Stock Option" under the U.S. Internal Revenue Code.

The Company is an at-will employer, which means that your employment with the Company is for no specific period of time and may be terminated by the Company or you at any time, with or without prior notice and with or without cause. Your employment pursuant to this offer is contingent on satisfactory reference and background checks, execution of this letter and the attached Confidentiality Agreement. You will also be required to provide the Company with legally acceptable proof of your identity and authorization to work in the United States within three days of your start date, and your failure to do so will render this offer of employment void and unenforceable. You agree to familiarize yourself with company policies and procedures, including but not limited to safety policies and procedures.

In the event of any dispute or claim relating to or arising out of your employment relationship with Company, this agreement, or the termination of your employment with Company for any reason (including, but not limited to, any claims of breach of contract, defamation, wrongful termination or age, sex, race, color, national origin, ancestry, religious creed, physical or mental disability or medical condition or other discrimination, retaliation or harassment), you and Company agree that all disputes shall be fully resolved by confidential, binding arbitration conducted by a single neutral arbitrator in Lehi, Utah through the American Arbitration Association ("AAA") pursuant to the AAA's Employment Arbitration Rules, which are available at the AAA's website at www.adr.org or by requesting a copy from the Human Resources Department. The arbitrator shall permit adequate discovery and is empowered to award all remedies otherwise available in a court of competent jurisdiction and any judgment rendered by the arbitrator may be entered by any court of competent jurisdiction. The arbitrator shall issue an award in writing and state the essential findings and conclusions on which the award is based. To the fullest extent permitted by applicable law, by signing this letter, you and Company both waive the rights to have any disputes or claims tried before a judge or jury. You and Company further agree that Company shall have the right to forgo arbitration and seek injunctive relief from the courts if you breach the non-disclosure, assignment, non-solicitation or non-competition covenants contained in the attached Confidentiality agreement. The mutual promise by Company and you to arbitrate any and all disputes between them, rather than litigate them before the courts or other bodies, provides the consideration for this agreement to arbitrate.

This arbitration agreement does not apply to or cover claims for which arbitration is unavailable, such as workers' compensation benefits, unemployment compensation benefits, or charges under the National Labor Relations Act. This arbitration agreement also does not alter any obligation, nor affect any right, to bring an administrative claim or

charge with the Equal Employment Opportunity Commission and/or similar state or local commissions or agencies with respect to discrimination, harassment, and retaliation claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or similar federal, state and/or local anti-discrimination laws that require exhaustion of administrative remedies prior to filing suit.

THE COMPANY AND YOU AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. Further, unless both Company and you agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

This letter, and the attachments hereto, sets forth the entire agreement between you and the Company regarding the terms of your employment with the Company and supersedes any prior representations, agreements, and understandings between you and any employee or representative of the Company whether written or oral. Any modification to this agreement shall be in writing and signed by you and an Officer of the Company. This agreement shall be construed and interpreted in accordance with the laws of the state of Utah.


If this offer is acceptable to you, please sign the original of this letter and the Confidentiality Agreement and return them to the Company. This offer will be deemed withdrawn if we do not receive your signature prior to 5:00 p.m. MST on March 01, 2019.


If you have any questions regarding this offer letter, please reach out to your recruiter. We look forward to having you join our Company.


Sincerely,

Divvy Pay, Inc.



Casey Bailey, Vice President, People & Places
Divvy Inc

I have read and understand the terms of the offer set out above.  As indicated by my signature below, I accept this employment offer as outlined above.  No further commitments were made to me as a condition of employment.


Danielle Cox

02/27/2019

# EXHIBIT 4



**Seyfarth Shaw LLP**
233 South Wacker Drive
Suite 8000
Chicago, Illinois 60606-6448
**T** (312) 460-5000
**F** (312) 460-7000

kmahoney@seyfarth.com
T (312) 460-5737


www.seyfarth.com

December 29, 2022

<u>Via FedEx and Email</u>

Danielle Cox
4882 N. Nile Drive
Lehi, UT 84043
daniellecox0@gmail.com

Re:     Bill.com Confidential and Trade Secret Information


Dear Ms. Cox:

Our firm is counsel to your employer, Bill.com, LLC ("Bill.com" or the "Company"). Please direct all future correspondence regarding this matter to our attention. If you are represented by legal counsel, please forward this correspondence to your attorneys immediately.

The Company has attempted to reach you several times since December 22, 2022 via email, letter correspondence, and text message to address several recent, troubling instances in which you accessed private and confidential Company data without authorization, downloaded confidential and/or trade secret information, and then synced that data to an unauthorized iCloud account. Those incidents, several of which are discussed below, are concerning enough on their own but your refusal to respond to any of the Company's attempts to contact you are exacerbating the situation. You must respond to this letter on or before **January 4, 2023**—if you continue to refuse to respond to the Company's concerns, we will assume that you do not intend to return the Company's confidential information, and the Company may seek any and all remedies available to it in a court of law as a result of your actions, including but not limited to seeking emergency injunctive relief related to the confidential Company information that you downloaded. If there is any chance of avoiding litigation and emergency injunction proceedings, and at this point it is unclear if there is such a chance, then it is imperative that you read this letter and that we receive a prompt response to the demands contained herein.

<u>*Your Actions with the Company's Data*</u>

The Company recently discovered that you accessed the Company's confidential and proprietary systems and data without authorization, and uploaded data and information to a folder synced with an unauthorized iCloud account. As you are aware, you requested to take FMLA leave on November 30, 2022 and were granted FMLA leave from the Company



beginning December 5, 2022. Furthermore, despite the fact that you were on leave and should not have been accessing the Company's data or systems after that date, the Company recently discovered that you continued to access systems and platforms after your leave began.  Of particular concern are several incidents that took place in late-November and continuing through the month of December 2022:

　　1.  The Company's records show that on December 2, 2022, you accessed and downloaded *nearly 5,800* emails from the inbox of your direct supervisor, Steve Januario. The Company's investigation determined that not only did you download these materials, but you also placed them in a folder on your Company-issued computer that is synced to an iCloud account with the user name "Danielle.cox@getdivvy.com". There is no legitimate reason why you would have needed to access your direct supervisor, Mr. Januario's emails that day, nor why you would download those emails and sync them to an unauthorized iCloud account.

.　　2. On the same day, December 2, 2022, you accessed the Company's Google Vault and conducted searches through not just your own Company-issued email account, but also the accounts of Mr. Januario, Rinki Sethi, and two People Team partners. Again, there is no legitimate reason why you would need to have accessed these accounts to run those targeted searches through Google Vault, nor any reason to place those materials in a folder synced to an unauthorized iCloud account from your Company-issued computer.

　　3. Between November 30, 2022 and December 7, 2022, using your Company-issued credentials, you requested five different exports of data from the Company's Slack account, including a manual export(s) of what appears to be the Company's *entire corporate Slack database*. You had no legitimate reason to access that data, and it is beyond concerning that you appear to have exported this data using your Company administrator credentials.

　　4. Between December 5, 2022 and December 20, 2022, you accessed the Company's Google Vault and continued to conduct searches for Company materials that you had no legitimate reason to access, including searches conducted through Mr. Januario's email account and those of other People Team Partners.

　　The incidents referenced above are only a sample 　　 of those that the Company is aware of at this time. Upon learning of those incidents, the Company suspended your access to its systems on December 21, 2022, and contacted you the next day to request an explanation of these events, as well as to demand the immediate return of your Company-issued laptop. You did not respond to that request, nor did you respond to follow-up correspondence sent to you by the Company on December 28, 2022. As of the date of this letter the Company has attempted to contact you multiple times, through both your personal email account and by hard copy letter sent to your home, requesting the immediate return of its property, all without a response from you.

<u>Your Obligations to the Company</u>

　　The materials that you downloaded and exfiltrated contain the Company's highly-sensitive, confidential, and trade secret information - information which you had no legitimate reason or authorization to access (much less remove from the Company's systems). The incidents referenced above, as well as your continuing refusal to return your Company-issued computer, are a serious violation of state and federal law regarding the Company's trade


secrets, as well as your obligations under various agreements with the Company. As an IT leader with the Company, you in particular know that your actions are a serious violation of the Company's Acceptable Use Policy, a copy of which is enclosed for your reference. Your removal of the items that you downloaded to external devices and/or an unauthorized iCloud account are also a serious violation of that policy, as well as your Proprietary Information and Inventions Agreement, a copy of which is also enclosed. The Company has given you multiple opportunities to explain your actions without any response, and you continue to refuse to return your Company-issued computer. Your refusal to respond to the Company's well-founded concerns leaves no conclusion other than that you do not intend to return the Company's property.

<u>Your Compliance with the Company's Demands</u>

As it appears that litigation is likely at this point based on your failure to respond to our attempts to retrieve your Company-issued equipment, we demand that you take immediate steps to ensure that all relevant information is preserved, including but not limited to any electronic metadata. ***You should not take any steps to alter, delete, move, or otherwise interact with the Company's data that you synced to your unauthorized iCloud account, nor with the Company's data that may reside anywhere else in your possession.*** The locations of such data may include, but are not limited to, the Company-issued computer that you have yet to return, any other personally-owned devices that you used to access the Company's systems or data, and any external hard drives or storage devices on which you saved the Company's data. Altering or interacting with any of that data may irreversibly alter it and spoil relevant evidence, which carries serious consequences under applicable law.

To have any chance of avoiding litigation, you must confirm the following in writing on or before **January 4, 2023**:

1. You must confirm that you have not, and will not, transfer, use, or disclose any of the Company's data in your possession, custody, or control to any third-party;

2. You must confirm that you will return, on or before January 5, 2023, your Company-issued computer. We will send a courier to your residence for the return of that device upon your confirmation;

3. You must confirm that you will agree to a forensic imaging of any devices or accounts which you used to access the Company's data or onto which you have placed any of the Company's data, including but not limited to the aforementioned "Danielle.cox@getdivvy.com" iCloud account, any other cloud-based platforms or devices on which the Company's data resides, and any personally-owned devices that you used to access the Company's data;

4. You must confirm that you will agree to a remediation protocol of the "Danielle.cox@getdivvy.com" iCloud account, as well any other cloud-based platforms or devices on which the Company's data resides, to ensure that the Company's data is permanently removed from those platforms and/or devices.

To emphasize again, we demand that you immediately cease and desist from accessing, transmitting, using, or in any way modifying any information that you improperly retained from the Company, including but not limited to the materials that you synced to the unauthorized



iCloud account referenced herein. If you do not confirm your compliance with the demands above on or before January 4, 2023, the Company will be forced to pursue whatever legal remedies are necessary in order to protect the confidential and trade secret information belonging to it, up to and potentially including seeking emergency injunctive relief from a federal court to compel you to return your Company-issued equipment as well as other appropriate measures. The Company does not wish to pursue this action but if you do not respond they have no choice but to take this action.

I can be reached at the address, email, or phone number above at any time - please have your legal representative contact me as soon as possible so that we can avoid judicial intervention in this matter. Nothing in this letter is intended to be, nor should it be construed as, a waiver of any rights available to the Company.

Very truly yours,

SEYFARTH SHAW LLP

Kevin J. Mahoney

KJM
Enclosures
cc:      Michael J. Burns (w/o enclosures)

# Acceptable Use Policy

| Identifier | P.IT.001 |
|---|---|
| **Effective Date** | March 1, 2022 |
| **Applicable to** | All employees, contractors, external parties with access to the Bill.com network |
| **Policy Owner** | VP, Information Technology |
| **Review Cycle** | Annual |

## 1. Acceptable Use Overview

Acceptable use defines how individuals must handle organizational resources including actions that are allowed and not allowed.

## 2. Purpose

The intent of the Acceptable Use Policy is to communicate expectations for Bill.com employees and contractors regarding access to and use of Bill.com information assets which include but not limited to information, electronic and computing devices, and network resources to conduct Bill.com business or interact with internal networks and business systems, whether owned or leased by Bill.com, the employee, or a third party. These rules are in place to protect users and Bill.com. Inappropriate use exposes Bill.com to risks including virus attacks, compromise of network systems and services, and legal issues.

## 3. Scope

The Bill.com Acceptable Use Policy applies to all employees, contractors, third parties, and any other individual or entity for which we employ, conduct business with and/or obtain services that require access to our network or sharing of data.

This policy is to be enforced in all jurisdictions where Bill.com and its subsidiaries operate in accordance with local or regional laws and regulations.



# 4. Policy

## 4.1 General Use and Ownership

- Bill.com confidential information stored on electronic and computing devices whether owned or leased by Bill.com, the employee or a third party, remains the sole property of Bill.com
- Users shall bear the responsibility for knowing and complying with applicable state and federal laws, rules and regulations, and contractual obligations when accessing Bill.com information assets
- Bill.com provides information assets as a resource to all employees, contractors, consultants, temporary and other workers. Each individual shall be responsible for properly using and protecting those resources
- Users have a responsibility to promptly report the theft, loss or unauthorized disclosure of Bill.com proprietary information
- Users may access, use or share Bill.com proprietary information only to the extent it is authorized and necessary to fulfill their assigned job duties
- Use of external information systems to access the Bill.com system is prohibited unless the appropriate security controls are verified and deemed adequate with an approved connection or processing agreement by InfoSec and Legal
- Users' access to Bill.com information assets (e.g., customer data) shall be restricted to need-to-know and minimum necessary
- Users shall be responsible for the use and protection of Bill.com information resources by using effective access controls (e.g., passwords) and by safeguarding those access controls (e.g. disclosing passwords)
- Users are required to handle, label, and store confidential data in accordance with the Data and Information Classification Policy
- Connection to the Internet, or use of a website, is a privilege and not a right. Any abuse of that privilege can result in legal and/or administrative action
- Users shall be allowed to use Bill.com information assets:
  - To which they have been granted authorized access
  - For Bill.com business and research purposes
  - For incidental personal use (Employees are responsible for exercising good judgment regarding the reasonableness of personal use.)
- Users shall be allowed incidental personal use so long as those activities are legal and do not violate:
  - Bill.com policies, including our Code of Conduct and Ethics
  - Contractual obligations
  - The safety, security, privacy, reputational and intellectual property rights of others.
  - Applicable restrictions on political or commercial activities
- Users are prohibited from syncing their personal iCloud and/or gmail/g-drive accounts on their corporate-issued devices
- The IT team provides appropriate hardware and software to employees for Bill.com business use only



- Bill.com reserves the right to audit and monitor networks and systems activities on a periodic basis to ensure compliance with this policy. In the event that use is determined to be contrary to Bill.com policy or applicable law, appropriate measures shall be taken
- Users shall ensure that unattended equipment has appropriate protection
- Users shall log-off computing devices when the session is finished (i.e., not just switch off the PC screen or terminal)
- Users shall safeguard unattended information system output devices (e.g., printers) to prevent unauthorized individuals from obtaining the output

\*Note: *Unless otherwise approved, employees and contractors with access to sensitive production data (i.e. bank partner data) seeking to temporarily work outside of U.S. or other approved jurisdiction or country of employment will have all such access disabled until return to primary location to ensure data is not processed outside of authorized boundaries*

## 4.2 Acceptable Password Use

- Passwords must be kept confidential and must not be written down or recorded electronically
- Passwords and accounts must not be shared. Providing access to another individual, either deliberately or through failure to secure its access, is prohibited
- Personal and Bill.com (business) passwords must be different
- Temporary passwords shall be changed at the first log-on.
- Passwords must meet the minimum requirements of Bill.com's Password Policy
- All computing devices must be secured with a password-protected screensaver with the automatic activation feature set to 5 minutes or less

## 4.3 User Acknowledgement and Agreement

User will not engage in the following activities:
- Disclose or share any Bill.com confidential data to unauthorized parties without proper authorization or approval
- Post, use or transmit content that they do not have the right to post or use, for example, under intellectual property, confidentiality, privacy or other applicable laws
- Post, use or transmit unsolicited or unauthorized content, including, but not limited to, advertising or promotional materials, "Junk mail", "Spam", "Chain letters", "Pyramid schemes", political campaign promotional material, and any other form of unsolicited or unwelcome solicitation or advertising
- Infringe upon copyrighted material of any kind, including the unauthorized downloading, copying, displaying, and/or distributing of copyrighted material. All such works should be considered protected by copyright law unless specifically stated otherwise. Any use of Bill.com information assets (e.g. network, email system, website, etc.) to access, display, send, transfer, modify, store or distribute copyrighted material (e.g., video/movies, music/audio, images, documents, software, text, etc.) is strictly prohibited
- Post, use or transmit content that contains software viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer



software or hardware or telecommunications equipment or otherwise interfere with or disrupt Bill.com information assets
- Post or transmit content that is harmful, offensive, obscene, abusive, invasive of privacy, defamatory, hateful or otherwise discriminatory, false and misleading, incites an illegal act, or is otherwise in breach of one's obligations to any person or contrary to any applicable laws and regulations
- Intimidate or harass another
- Use or attempt to use another employee, contractor, consultant, temporary, and other workers' account, service, or personal information
- Remove, circumvent, disable, damage or otherwise interfere with any security related features
- Attempt to gain unauthorized access to Bill.com information assets, other user's accounts, computing devices or networks connected to Bill.com information technology resources, through hacking, password mining or any other means, or interfere or attempt to interfere with the proper working of Bill.com information assets or any activities conducted through those information assets
- Impersonate another person or entity, or falsely state or otherwise misrepresent one's affiliation with a person or entity
- Conduct any activities with the intention of creating and/or distributing malicious programs using Bill.com's network (e.g., viruses, worms, Trojan Horses, etc.)
- Install or use unauthorized or malicious software, or obtain data and software from external networks
- Fail to exercise appropriate caution when opening emails, attachments or accessing external web sites

All users shall read and acknowledge the Acceptable Use Policy before receiving access to information assets, be responsible for appropriately securing their computers and other electronic devices from misuse or theft by others; and for avoiding any use that interferes with others' legitimate access to and use of Bill.com information assets.

## 4.4 Monitoring

- While Bill.com desires to maintain privacy and to avoid the unnecessary interruption of activities, Bill.com reserves the right to investigate unauthorized or improper use of computing devices, which may include the inspection of personal data stored or transmitted on Bill.com's network. In the event that use is determined to be contrary to Bill.com policy or applicable law, appropriate measures shall be taken
- Information asset owners shall approve the use of information assets and take appropriate action when unauthorized activity occurs

## 5.    Roles and Responsibilities

| Role | Responsibilities |
|------|------------------|
| IT Team | Enforce the IT policy |



Internal Use Only

| | |
|---|---|
| Infosec | Support the development and enforcement of policies and standards |

## 6. Policy Governance

This policy is owned by the individual designated as the VP, Information Technology of Bill.com.

Review of this policy is required at a minimum annually in line with the last review date indicated in the Revision History section of this document or at the time of significant changes to the internal or external environment.

All new employees and contractors must complete mandatory security awareness training inclusive of review of this policy and supporting security policies.

Policy exceptions must be submitted via request to InfoSec Governance Risk and Compliance (GRC) for review and decisioning. If approved, an exception is effective for one year from the approved date and must be renewed. If a request is rejected, the control owner must identify and document a plan of action to reach compliance with this policy.

## 7. Policy Compliance

Adherence to this policy will be verified through various methods, including but not limited to, periodic walk-throughs, internal and external audits, metrics, and feedback to the policy owner.

## 8. Policy Violations

Any known violations of this policy should be reported to the InfoSec GRC team at grc@hq.bill.com. Any Bill.com user found to have violated any policy, standard or procedure may be subject to disciplinary action, up to and including termination of employment.

## 9. Related Policies, Standards, and Procedures

| Policy, Standard, and Procedure | Purpose |
|---|---|
| Written Information Security Program (WISP) | Provides definitive information on the prescribed measures used to establish and enforce the information security program at Bill.com. |
| Information Security Policy | Provides the directives that will ensure the highest degree of safeguarding of the data we collect, process, transmit and store. |
| Data and Information Classification Policy | To ensure that information is classified and |



| | protected in accordance with its importance to the organization. |
|---|---|
| Data and Information Handling Standard | Defines handling procedures for information in the various classification categories. |
| End User Device Standard | Establishes provisions for using, configuring, acquiring, accessing, maintaining, protecting, and securing end-user computing devices. |

## 10. References

### 10.1 Bill.com Resources

[Bill.com Policies and Procedures Wiki](#)

### 10.2 Laws, Rules, Regulations & Other Requirements

- Sarbanes Oxley (SoX)
- New York Department of Financial Services (NYDFS)
- Health Insurance Portability and Accountability Act (HIPAA)
- General Data Protection regulation (GDPR)
- California Consumer Protection Act (CCPA)
- Payment Card Industry - Data Security Standard (PCI - DSS)
- FTC Safeguards

### 10.3 Best Practices

- National Institute of Standards and Technology (NIST)
- International Standards Organization (ISO) 27001 and 27002
- Secure Controls Framework (SCF)

### 10.4 Control References

Key Control Mapping: **NIST CSF**: PR.PT-2; **SCF**: CFG-04, HRS-05, HRS-05.1, HRS-05.5, NET-12.2; **ISO 27001**: A.8.1.3

## 11. Point of Contact

For questions on this policy or to escalate potential violations, please contact the InfoSec Governance Risk and Compliance (GRC) team at grc@hq.bill.com.

## 12. Terms and Definitions

None



## Revision History

| Version | Date | Author | Revisions | Approved By |
|---------|------|--------|-----------|-------------|
| 2.0 | 2/19/2022 | IT Team | Annual Review | Jonathan Chan |
| 2.0 | 3/10/2022 | Infosec GRC | Annual Review | Netsai Massetti |
| 2.0 | 10/24/2022 | Infosec GRC | Update made to section 4.1 | Netsai Massetti |



PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT
*[Use for Full-Time Employees and Consultants]*

In consideration of my employment or engagement by Divvy Pay, Inc. (the "*Company*"), the Company's disclosure of or agreement to disclose certain Proprietary Information (as defined below) to me, any compensation now and/or hereafter paid to me, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agrees with the Company as follows:

1. Definitions.

1.1 The term "*Agreement*" means this Proprietary Information and Inventions Agreement.

1.2 The term "*Service*" means any period during which I am engaged as a full-time employee or consultant of the Company.

1.3 The term "*Inventions*" means discoveries; developments; trade secrets; processes; formulas; data; lists; software programs; and all other works of authorship, mask works, ideas, concepts, know-how, designs, and techniques, whether or not any of the foregoing is or are patentable, copyrightable, or registrable under any intellectual property laws or industrial property laws in the United States or elsewhere.

1.4 The term "*Proprietary Information*" means information owned by the Company or licensed from third parties regarding (a) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, contracts and other agreements, suppliers, customers, and customer lists; (b) the identity, skills and compensation of employees, contractors, and consultants; (c) specialized training; and (d) information related to Inventions owned by the Company or licensed from third parties.

1.5 The term "*Third Party Information*" means confidential or trade secret information that the Company may from time to time receive from third parties or information related to Inventions of third parties, which is subject to a duty on the Company's part to maintain the confidentiality of such Third Party Information and to use it only for certain limited purposes.

2. Nondisclosure.

2.1 I acknowledge that contemporaneously with my execution of this Agreement, the Company is providing me with Proprietary Information and/or initial specialized training. In consideration of the Company's

provision of Proprietary Information and initial specialized training, I agree that during my Service and thereafter, pursuant to this agreement, I will hold in strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with my Service, or unless the President or Board of Directors of the Company expressly authorizes such in writing. I also agree that in connection with this Agreement, I will also be bound by the provisions of Section 8.

2.2 At all times during my Service and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Third Party Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with my Service, or unless the President or the Board of Directors of the Company expressly authorizes such in writing.

3. Assignment.

3.1 The term "*Ownership Rights*" means all rights, title, and interest (including but not limited to Intellectual Property Rights) in property, whether that property is tangible or intangible. The term "*Intellectual Property Rights*" means all intellectual property and industrial property rights of any kind whatsoever throughout the world, including but not limited to patent rights, copyrights (including but not limited to mask work rights), trade secret rights, and, if recognized, Moral Rights (where "*Moral Rights*" means all rights related to paternity, integrity, disclosure, and withdrawal). I hereby irrevocably assign to the Company any Ownership Rights I may have or acquire in any Proprietary Information and acknowledge that all Proprietary Information shall be the sole property of the Company and that the Company shall be the sole owner of all Ownership Rights in connection therewith.

3.2 The term "*Company Inventions*" means all Inventions that (a) relate to the business or proposed business of the Company and that are discovered, developed, created, conceived, reduced to practice, made, learned or written by me, either alone or jointly with others, in the course of my Service; (b) utilize, incorporate or otherwise relate to Proprietary Information; (c) I discovered, developed, created, conceived, reduced to practice, made, or wrote prior to or outside the scope of my Service and that are incorporated into any Inventions owned by or assigned to the Company and/or its assigns; or (d) are discovered, developed, created, conceived, reduced to practice, made, or written by me using Company property or equipment. I hereby irrevocably assign to the Company all my Ownership Rights in and to any and all Company Inventions.

3.3 I acknowledge and agree that any work of authorship comprising Company Inventions shall be deemed to be a "*work made for hire*," as that term is defined in the United States Copyright Act (17 U.S.C. § 101

(2000)). To the extent that any such work of authorship may not be deemed to be a work made for hire, I hereby irrevocably assign all my Ownership Rights in and to such work to the Company. If any such work of authorship cannot be assigned, I hereby grant to the Company an exclusive, assignable, irrevocable, perpetual, worldwide, sublicensable (through one or multiple tiers), royalty-free, unlimited license to use, reproduce, distribute, create derivative works of, publicly perform, publicly display and digitally perform and display such work in any media now known or hereafter known. Outside the scope of my Service, I agree not to (a) modify, adapt, alter, translate, or create derivative works from any such work of authorship or (b) merge any such work of authorship with other Inventions. To the extent, Moral Rights may not be assignable under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby irrevocably waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

3.4 I acknowledge and agree that nothing in this Agreement shall be deemed to grant, by implication, estoppel or otherwise, (a) a license from the Company to me to make, use, license, or transfer in any way a Company Invention or (b) a license from the Company to me regarding any of the Company's existing or future Ownership Rights.

4. Enforcement of Rights.

4.1 I will assist the Company in every proper way to obtain and from time to time enforce Ownership Rights relating to Company Inventions in any and all countries. To that end, I will execute, verify, and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining, and enforcing such Ownership Rights and the assignment thereof. In addition, I will execute, verify, and deliver assignments of such Ownership Rights to the Company. My obligation to assist the Company with respect to Ownership Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my Service, but the Company shall compensate me at a reasonable rate after such termination for the time actually spent by me at the Company's request on such assistance.

4.2 In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its assigns' duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf to execute, verify, and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph thereon with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, that I now or may hereafter have for infringement of any Ownership Rights assigned hereunder to the Company.

5. Obligation to Keep Company Informed.

During my Service, I will promptly disclose to the Company fully and in writing and will hold in trust for the sole right and benefit of the Company any and all Company Inventions. In addition, during the first year after termination of my Service, I will provide the Company with a complete copy of each patent application and copyright registration application (including but not limited to any mask work registration application) filed by me or that names me as an inventor, co-inventor, author, co-author, creator, co-creator, developer, or co-developer.

6. Retained Inventions.

To preclude any possible uncertainty over the ownership of any Inventions, I have, to the best of my knowledge, set forth on Exhibit A attached hereto a complete list of all Inventions that I have, alone or jointly with others, prior to the commencement of my Service, discovered, developed, created, conceived, reduced to practice, made, learned, or written, or caused to be discovered, developed, created, conceived, reduced to practice, made, learned, or written, that I consider to be my property or the property of third parties (collectively, " *Retained Inventions*"). If disclosure of any such Invention on Exhibit A would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Inventions in Exhibit A but am to inform the Company that all Inventions have not been listed for that reason. To the extent that I incorporate any Retained Inventions into a Company Invention or rely upon any Retained Invention in discovering, developing, creating, conceiving, or reducing to practice any Company Invention, I hereby grant to the Company a non-exclusive, assignable, irrevocable, perpetual, worldwide, sublicensable (through one or multiple tiers), royalty-free license to use, reproduce, distribute, create derivative works of, publicly perform, publicly display, digitally perform and display, make, have made, sell, and offer for sale such Retained Inventions in any media now known or hereafter known.

7. Non-Competition; Non-Solicitation.

7.1 During my Service, I will not, directly or indirectly, participate in the ownership, management, operation, financing or control of, or be employed by or consult for or otherwise render services to, any person, corporation, firm, or other entity that competes with the Company in the state of Utah, or in any other state in the United States, or in any country in the world, in the conduct of the business of the Company as conducted or as proposed to be conducted, nor shall I engage in any other activities that conflict with my obligations to the Company.

7.2 During my Service and for a period of one year after my Service is terminated for any reason, I will not, directly or indirectly, individually or on behalf of any other person, firm, partnership, corporation, or business entity of any type, solicit, assist or in any way encourage any current employee or consultant of the Company to terminate his or her employment relationship or consulting relationship with or for the Company,

nor will I solicit the services of any former employee of the Company whose service has been terminated for less than three months.

7.3 During my Service and for a period of two years after my Service is terminated for any reason, I will not, directly or indirectly, individually or on behalf of any other person, firm, partnership, corporation, or business entity of any type, solicit to the detriment of the Company and/or for the benefit of any competitor of the Company, take away or attempt to take away, in whole or in part, any Customer of the Company ,or otherwise interfere with the Company's relationship with any Customer. For purposes of this Section 7.3, "*Customer*" shall mean any company or business entity to which the Company sells or licenses goods or services to, or that I had contact with or performed services for during my Service.

8. Post-Employment Non-Compete.

I hereby agree that for a period of one year after my Service is terminated for any reason, I will not directly or indirectly, in the state of Utah, or in any other State of the United States, or in any country in the world where the Company engages or proposes to engage in Business, as of the date of the termination of my Service, (i) compete with the Company in Business, or (ii) participate in the ownership, management, operation, financing or control of, or be employed by or consult for or otherwise render services to, any person, corporation, firm or other entity that competes with the Company in Business. Notwithstanding the foregoing, I am permitted to own up to 1% of any class of securities of any corporation in competition with the Company that is traded on a national securities exchange or through Nasdaq. For the purposes of this Section 8, "*Business*" shall mean those portions of the Company's business in which I actively participated, or regarding which I received Proprietary Information.

9. No Improper Use of Materials.

I represent and warrant that during my Service I shall not use or incorporate into any Company Invention any confidential information or trade secrets of any former employer, any person or entity for whom I provided services, or any other person or entity unless I have obtained all consents, licenses, or other rights necessary to allow me to provide the Company with the assignments and licenses set forth herein. I represent and warrant that during my Service I shall not improperly use or disclose any confidential or trade secret information, if any, of any former employer or any other person or entity to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person or entity to whom I have an obligation of confidentiality unless expressly consented to in writing by that former employer, person, or entity.

10. No Conflicting Obligation.

I represent that my performance of all the terms of this Agreement and my Service does not and will not breach any agreement between me and any other employer, customer, person or entity. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

11. Return of Company Property.

When my Service is completed, I will immediately deliver to the Company all drawings, notes, memoranda, specifications, devices, formulas, and documents (whether written, printed, or otherwise reproduced or recorded), together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information. I will also immediately deliver all Company property; including but not limited to laptops, pagers, cell phones, corporate credit cards, keys and/or access cards. I further agree that all property situated on the Company's premises and owned, leased, or licensed by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of the Company at any time with or without notice.

12. Legal and Equitable Remedies.

Because my services are personal and unique and because I will have access to and become acquainted with Proprietary Information, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

13. Authorization to Notify New Employer.

I hereby authorize the Company to notify any new employer or entity for which I provide services about my rights and obligations under this Agreement following the termination of my Service.

14. Notices.

Any notices required or permitted hereunder shall be given to the appropriate party at the party's last known address. Such notice shall be deemed given upon personal delivery to the last known address or if sent by certified or registered mail, three days after the date of mailing.

15. General Provisions.

15.1 Governing Law. This Agreement will be governed by and construed according to the laws of the State of Utah, without regard to conflicts of law principles.

15.2 Exclusive Forum. I hereby irrevocably agree that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Utah, and I agree to the exclusive personal jurisdiction and venue of any court in Utah County, Utah and waive any defense thereto.

15.3 Entire Agreement. This Agreement, and any offer letter, consulting agreement or employment agreement signed concurrently herewith, supersedes and merges all prior discussions between us relating to the subject matter hereof. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

15.4 Severability.
   a.  I acknowledge and agree that each agreement and covenant set forth herein constitutes a separate agreement independe

   b.  I understand and agree that Section 8 of this Agreement is to be enforced to the fullest extent permitted by law. According

15.5 Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives and will be for the benefit of the Company, its successors and assigns. I expressly agree that the Company has the right to assign this Agreement.

15.6 Survival. The provisions of this Agreement shall survive the termination of my Service for any reason and the assignment of this Agreement by the Company to any successor in interest or other assignee(s).

15.7 At-Will Relationship. I agree and understand that my Service is at will, which means that either I or the Company may terminate the relationship at any time, with or without prior notice and with or without cause. I further agree and understand that nothing in this Agreement shall confer any right with respect to the continuation of Service, nor shall it interfere in any way with my right or the Company's right to terminate my Service at any time, with or without cause.

15.8 Waiver. No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

15.9 Recovery of Attorney's Fees. In the event of any litigation arising from or relating to this Agreement, the prevailing party in such litigation proceedings shall be entitled to recover, from the non-prevailing party, the prevailing party's reasonable costs and attorney's fees, in addition to all other legal or equitable remedies to which it may otherwise be entitled.

15.10 Headings; Counterparts. The headings to each section or paragraph of this Agreement are provided for convenience of reference only and shall have no legal effect in the interpretation of the terms hereof. This Agreement may be executed in counterparts and by facsimile signatures. *[Signature Page Follows]*

I HAVE READ THIS PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.

This Agreement shall be effective as of the first day of my Service.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS MY RIGHTS TO INVENTIONS I MAKE DURING MY SERVICE, RESTRICTS MY RIGHT TO DISCLOSE OR USE PROPRIETARY INFORMATION DURING OR SUBSEQUENT TO MY PERIOD OF SERVICE, AND PROHIBITS ME FROM COMPETING WITH THE COMPANY AND/OR FROM SOLICITING EMPLOYEES AND CUSTOMERS OF THE COMPANY DURING MY SERVICE AND FOR A PERIOD OF TIME AFTER MY SERVICE IS TERMINATED FOR ANY REASON.

Employee

Danielle Cox
Dated: 02/27/2019

Accepted and agreed to:
Divvy Inc

By:

Name: Casey Bailey

If you have inventions to disclose, you can download the invention disclosure document and email to peopleteam@divvypay.com or complete along with onboarding.